**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTINE ANDERSON, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  vs.<br><br>CONTINENTAL AKTIENGESELLSCHAFT; CONTINENTAL TIRE THE AMERICAS, LLC; COMPAGNIE GÉNÉRALE DES ÉTABLISSEMENTS MICHELIN SCA; COMPAGNIE FINANCIÈRE MICHELIN SA; MICHELIN NORTH AMERICA, INC.; NOKIAN TYRES PLC; NOKIAN TYRES INC.; NOKIAN TYRES U.S. OPERATIONS LLC; THE GOODYEAR TIRE & RUBBER COMPANY; PIRELLI & C. S.P.A.; PIRELLI TIRE LLC; BRIDGESTONE CORPORATION; BRIDGESTONE AMERICAS, INC.; AND DOES 1-100,<br><br>        Defendants. | CIVIL ACTION NO.<br><br><br><br>**CLASS ACTION COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**<br><br>(<u>Jury Demand Endorsed Hereon</u>) |

Plaintiff, Christine Anderson, brings this action individually and on behalf of a class of all others similarly situated against Defendants,[1] and alleges the following:

## I.    NATURE OF THE ACTION

1.    Defendants are among the largest manufacturers of tires in the world. They control nearly two-thirds of the global market for tires.

2.    The market for tires is significant. Hundreds of millions of tires are sold annually in the United States and the vast majority of those are replacement tires. The annual domestic market for replacement tires exceeds $60 billion.

3.    Beginning from January 1, 2020, through the present, Defendants entered into an unlawful agreement to artificially increase, maintain, stabilize and fix the prices of replacement tires sold in the Unites Staes for passenger cars, vans, trucks and busses.

4.    Defendants effectuated their price fixing conspiracy by, among other means, signaling price increases during earnings calls and other public statements, implementing revenue management software to facilitate and exchange pricing information, participating in annual industry meetings and coordinating supply reductions to keep prices artificially high.

5.    On January 30, 2024, the European Commission ("EC") announced dawn raids at the premises of "companies active in the tyres industry in several Member States."[2] The EC justified its dawn raids over suspicion that these companies "violated EU antitrust rules that prohibit cartels and restrictive business practices," and further announced that it suspected

---

[1] "Defendants" collectively refers to Continental Aktiengesellschaft; Continental Tire the Americas, LLC; Compagnie Générale Des Établissements Michelin SCA; Compagnie Financière Michelin SA; Michelin North America, Inc.; Nokian Tyres PLC; Nokian Tyres INC.; Nokian Tyres U.S. Operations LLC; The Goodyear Tire & Rubber Company; Pirelli & C. S.P.A.; Pirelli Tire LLC; Bridgestone Corporation; Bridgestone Americas, Inc.; and Does 1-100.

[2] European Commission Press Release, "Commission carries out unannounced antitrust inspections in the tyres sector." https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

Defendants engaged in illegal price coordination.[3]

6.      Defendants' conduct is facially anticompetitive and illegal per se.  As a direct result of Defendants' conspiracy, Plaintiff and the Class purchased Tires directly from Defendants at artificially inflated prices and were thereby directly injured in their business or property.

## II.    <u>JURISDICTION AND VENUE</u>

7.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

8.      This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22.  Defendants have sufficient minimum contact with the United States and the State of Ohio.  Defendants purposefully directed their business activity toward the State of Ohio.  Plaintiff's claim for relief arises from and relates to illegal acts committed by Defendants within this jurisdiction.

9.      Additionally, Defendants, The Goodyear Tire & Rubber Company and Continental Tire the Americas, LLC, are organized under the laws of Ohio and have their principal places of business in Ohio.  Defendant, Bridgestone Americas, Inc., also operates a manufacturing facility in Ohio.

10.      Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of tires.

11.      Venue is properly laid in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendant maintains business facilities, has agents, transacts business, and is otherwise found within this District, and certain of the unlawful acts alleged herein were performed and had effects within this

---

[3]  *Id.*

District.

## III.    **THE PARTIES**

### A.    **Plaintiff**

12.     Plaintiff Christine Anderson is a citizen and resident of the State of Florida.  Ms. Anderson purchased Tires directly from one or more Defendants during the Class Period, paying higher prices for the tires than she would have in the absence of the anticompetitive behavior.

### B.    **Defendants**

#### 1.    **Continental Defendants**

13.     Defendant, Continental Aktiengesellschaft ("Continental AG"), is a German company with its headquarters at Vahrenwalder Strasse 9, 30165 Hannover, Germany. Continental AG has four group sectors: Automotive, Tires, ContiTech, and Contract Manufacturing. The Tires group has five business areas: (i) Original Equipment, (ii) Replacement APAC, (iii) Replacement EMEA, (iv) Replacement the Americas, and (v) Specialty Tires. In 2022, Continental AG reported sales of €14 billion (over $15 billion) globally for the Tires group. Continental AG manufactures tires in Europe, the United States, and China for sale in the United States and elsewhere.

14.     Defendant, Continental Tire the Americas, LLC ("Continental U.S."), is a limited liability company organized under the laws of Ohio, with its principal place of business at 1830 MacMillian Park Drive, Fort Mill, SC 29707.  Continental U.S. manufactures and distributes a complete line of passenger, light truck, and commercial tires for original equipment and replacement markets.  Continental U.S. sells its tires through independent tire dealers, car dealers, and mass retail companies across North America.  Continental U.S. has manufacturing facilities across the United States, including in Barnseville, Georgia; Mt. Vernon, Illinois; Sumter, South Carolina; and Jackson, Missouri.  Continental U.S. employs hundreds of individuals in its United States facilities.

### 2.    Michelin Defendants

15.    Defendant, Compagnie Générale des Établissements ("CGEM"), is organized under the laws of France with its principal place of business at 23 place des Carmes-Déchaux, 63000 Clermont-Ferrand, France.  CGEM is the Michelin Group's parent company, which directly or indirectly owns all of its subsidiaries.  CGEM's two main subsidiaries are Manufacture Française des Pneumatiques Michelin ("MFPM"), a wholly owned subsidiary that coordinates all of the Group's manufacturing, sales, and research operations in France, and Compagnie Financière Michelin ("CFM"), a wholly owned subsidiary that owns most of the Group's manufacturing, sales, and research companies outside of France and coordinates their operations.

16.    Defendant, Michelin North America, Inc. ("Michelin North America"), is a corporation organized under the laws of the State of New York with its principal place of business at One Parkway South, Greenville, SC 29615-5022. Michelin designs, manufactures, and sells tires for every type of vehicle, including airplanes, automobiles, bicycles, earthmovers, farm equipment, heavy-duty trucks, and motorcycles.  Michelin is one of the leading manufacturers of tires in the United States.  In 2022, Michelin had more than $9 billion in sales in the United States.  Michelin employs 23,000 people across 34 plants in the United States and Canada.  Michelin has manufacturing facilities in Alabama (light trucks and passenger tires), Indiana (car tires), Oklahoma (passenger tires), and South Carolina (passenger tires and truck and bus tires).

17.    CGEM and Michelin North America are referred to collectively as "Michelin."

### 3.    Nokian Tyres Defendants

18.    Defendant, Nokian Tyres plc, is organized under the laws of Finland with its principal place of business at Pirkkalaistie 7, P.O. Box 20, 37101 Nokia, Finland.  Nokian Tyres plc is the parent company of the Nokian Tyres Group, which includes subsidiaries worldwide. Nokian Tyres plc develops and manufactures tires for passenger cars, trucks, and heavy machinery. In 2019, the company's net sales were $1.8 billion, and it employed some 4,700

people.

19.     Defendant, Nokian Tyres Inc., is a corporation organized under the laws of the State of Delaware. It is a wholly owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.  In December of 2018, Nokia Tyres announced its  new headquarters located in Nashville, Tennessee, which would house Nokia Tyres' Vice President, along with members of the company's sales, customer service, IT, logistics, finance, and marketing teams.  In 2017, Nokian Tyres announced it had opened a $360 million manufacturing facility located in Tennessee.  The manufacturing facility produces car and light truck all season tires and all-weather tires for consumers in the United States and Canada.

20.     Defendant, Nokian Tyres U.S. Operations LLC, is a limited liability company organized under the laws of the State of Tennessee.  It is a wholly owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.

21.     Nokian Tyres plc, Nokian Tyres Inc., and Nokian Tyres U.S. Operations LLC are referred to collectively as "Nokian Tyres."

### 4.     Goodyear

22.     Defendant, The Goodyear Tire & Rubber Company ("Goodyear"), is a corporation organized under the laws of the State of Ohio with its principal place of business at 200 Innovation Way, Akron, Ohio 44316-0001.  Goodyear manufactures its products in facilities in 23 countries and has operations in most regions of the world.  Goodyear manufactures and sells under the Goodyear, Cooper, Dunlop, Kelly, Debica, Sava, Fulda, Mastercraft, and Roadmaster brands. Approximately 86% of Goodyear's sales in 2022, 85% in 2021 and 84% in 2020 were for tire units. The principal channel for the sale of Goodyear and Cooper brand tires in the United States is a large network of independent dealers. Goodyear, Cooper, Dunlop, Kelly, and Mastercraft brand tires are also sold to numerous national and regional retailers, in Goodyear Company-owned stores in the United States, and through the wholesale channel, including through TireHub,

LLC, Goodyear's national wholesale tire distributor in the United States, and a network of aligned U.S. regional wholesale tire distributors.

     **5.    Pirelli Defendants**

23.    Defendant, Pirelli & C. S.p.A. ("Pirelli & C"), is organized under the laws of Italy with its principal place of business at Via Bicocca degli Arcimboldi, 3, 20126 Milano MI, Italy. Pirelli & C designs, manufactures, and distributes tires for cars, motorcycles, and bicycles. Pirelli & C has a commercial presence in over 160 countries and 19 manufacturing sites in 12 countries.

24.    Defendant, Pirelli Tire LLC ("Pirelli Tire"), is a limited liability company organized under the laws of Delaware with its principal place of business located at 100 Pirelli Drive, Rome, GA 30161.  Pirelli Tire's facilities include a research and development center at its Rome, Georgia headquarters, as well as sales and marketing offices in New York City, Los Angeles, Detroit, Montreal, Atlanta, and Los Angeles.  Pirelli Tire manufactures, distributes, and markets original equipment and replacement tires for export and domestic car/motorcycle applications.

25.    Pirelli & C and Pirelli Tire are referred to collectively as "Pirelli."

     **6.    Bridgestone Defendants**

26.    Defendant, Bridgestone Corporation, is organized under the laws of Japan with its principal place of business at 1-1, Kyobashi 3-chome, Chuo-ku, Tokyo 104-8340.  Bridgestone Corporation is the parent corporation of the Bridgestone Group (the "Group"), which refers to all Group companies, including Bridgestone Americas ("BSAM"), Bridgestone China, Asia Pacific ("BSCAP"), Bridgestone Europe, Russia, Middle East, India, and Africa ("BSEMIA"), and Bridgestone Japan ("BSJP").  Bridgestone Corporation is the world's largest tire and rubber company.

27.    Defendant, Bridgestone Americas, Inc. ("BSAM"), is incorporated under the laws of Nevada with its principal place of business at 200 4th Ave, Suite 100, Nashville, Tennessee,

37201-2256. BSAM and its subsidiaries develop, manufacture, and market a wide range of Bridgestone, Firestone, and associate brand tires to address the needs of a broad range of customers, including consumers, automotive and commercial vehicle original equipment manufacturers, and those in the agricultural, forestry and mining industries. BSAM has U.S. manufacturing facilities in Arkansas, Georgia, Iowa, Illinois, North Carolina, Ohio, South Carolina, Tennessee, and Texas.

28.    Bridgestone Corporation and BSAM are referred to collectively as "Bridgestone."

### 7.    Agents and Co-Conspirators

29.    The anticompetitive and unlawful acts committed by Defendants alleged in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

30.    Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

31.    Doe Defendants 1–100 are other individuals or entities who engaged in the unlawful conduct as co-conspirators to Defendants.  Plaintiff may amend this Complaint to allege the names of additional Defendants as they are discovered.

32.    Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

33.    When Plaintiff refers to a corporate family or companies by a single name in this Complaint, Plaintiff is alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts on behalf of every company within that family.  Because Defendants market themselves as corporate families, individual participants in the conspiratorial

acts did not always know the corporate affiliation of their counterparts, nor did recognize the distinction between the entities within a corporate family. Furthermore, to the extent that subsidiaries within corporate families distributed the tire products discussed in this Complaint, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut their pricing agreements.  Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices.

34.     Each Defendant named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

35.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV.    FACTUAL ALLEGATIONS

### A.     U.S. Tire Market

36.     Almost all vehicles with wheels require Tires as a critical component part.  In the United States, nearly 300 million vehicles that have Tires.

37.     During the Class Period, annual shipments of Tires in the United States exceeded 300 million per year.

38.     Total revenue for the U.S. replacement Tire market in 2022 exceeded $60 billion.

39.     Each Defendant sells billions of dollars of Tires in the United States each year. Michelin reported over $8.7 billion worth of sales in the United States in 2022 an increase from the $6.7 billion in 2021.  Goodyear reported $10.7 billion of sales in the U.S. 2022 increasing from $8.5 billion in 2021.  While Continental does not break out U.S. sales, it reported Tire sale revenue of $4.4 billion (€4.2 billion) in North America in 2022.  Likewise, Bridgestone does not break out its U.S. sales, but reported $15 billion (¥1.99 trillion) in sales to the Americas in 2022.20 Pirelli reported $1.7 billion (€1.6 billion) in sales in North America in 2022.  Finally, Nokian

reported net sales of $331.3 million (€314.6 million) in the Americas in 2022.

40.     Defendants sell Tires for use in new cars ("Original Equipment Tires" or "OE" Tires) or as replacement Tires ("Replacement Tires"). OE Tires are selected by the vehicle manufacturer. Car manufacturers and Tire companies work together to match Tires having certain specifications, such as handling, efficiency and longevity, to new vehicles.  By contrast, Dedicated Replacement Tires are selected by individual consumers. Again, consumers may look to such characteristics as noise, handling, longevity, and fuel efficiently when purchasing replacement.

**B.     Defendants' Participation in the Tire Market**

41.     Three Defendants control the majority of the U.S. Tire market.  In 2022, Bridgestone, Michelin, and Goodyear made up almost 64% of the entire Replacement Tire market.  These three Defendants also encompass subsidiary brands: (i) **Bridgestone**, Firestone, and Fuzion, (ii) **Michelin**: Michelin, BF Goodrich, and Uniroyal, and (iii) **Goodyear**: Goodyear, Cooper Tires, Dunlop, and Kelly. These same Defendants have controlled the market for years. The remaining 36% of the market includes manufacturers such as Continental and Nokian.  The following demonstrates the relative market shares for the three companies: [4]



[4] Traqline, *The 'Goliaths' of the Replacement Tire Industry Are Getting Bigger. How Can The 'Davids' Compete?* (Feb. 14, 2022) https://www.traqline.com/newsroom/blog/the-goliaths-of-the-replacement-tire-industry-are-getting-bigger-how-can-the-davids-compete/.

42.     Defendant Bridgestone is the world's largest tire and rubber company, with about 130 manufacturing plants and R&D facilities in 25 countries. It sells products in more than 150 countries worldwide.  In 2021, Bridgestone reported a tire-related revenue is excess of $29 billion.

43.     The other Defendants boast similar market presences. Each Defendant has a worldwide commercial presence.

44.      A small group of competitors controlling the vast majority of the market, as here, renders a market more susceptible to collusion. The smaller the group, the easier it is to coordinate and agree on prices, maintain the secrecy of the anti-competitive behavior, and to ensure that conspirators honor the terms of the conspiracy by identifying and punishing defectors when there are fewer participants.

45.     Thus, Defendants' conspiracy was able to increase prices in lockstep.

**C.     Tire Prices in the United States Increased Dramatically During the Relevant Period.**

46.     The price level of replacement Tires was stable for years before the relevant period, changing only by small amounts slowly. However, during the Class Period, the prices of replacement Tires increased at a rate inconsistent with previous price increases.



47.     Between 2022 and 2023, tire manufacturers announced price increases ranging

between 5 to 10%.[5]

48.    The lockstep nature of Defendants' prices increases is illustrated by the table below.

| Defendant | Effective Date | Price Increase |
|---|---|---|
| Bridgestone | November 1, 2020 | Up to 8% |
| Goodyear | December 1, 2020 | Up to 5% |
| Bridgestone | January 1, 2021 | Undisclosed |
| Pirelli | January 1, 2021 | Undisclosed |
| Michelin | February 1, 2021 | Up to 5% |
| Continental | March 1, 2021 | Undisclosed |
| Michelin | April 1, 2021 | Up to 8% |
| Goodyear | April 1, 2021 | Up to 8% |
| Pirelli | April 15, 2021 | Up to 7% |
| Bridgestone | May 1, 2021 | Up to 8% |
| Goodyear | June 1, 2021 | Up to 8% |
| Michelin | July 1, 2021 | Up to 6% |
| Continental | July 1, 2021 | Undisclosed |
| Pirelli | July 1, 2021 | Up to 6% |
| Goodyear | September 1, 2021 | Up to 8% |
| Michelin | September 1, 2021 | Up to 14% |
| Continental | October 1, 2021 | Undisclosed |
| Pirelli | October 1, 2021 | Up to 8% |
| Michelin | January 1, 2022 | Up to 12% |
| Goodyear | January 1, 2022 | Up to 12% |
| Continental | January 3, 2022 | Undisclosed |
| Pirelli | January 17, 2022 | Up to 10% |
| Continental | April 1, 2022 | Undisclosed |
| Michelin | April 1, 2022 | Up to 5% |
| Bridgestone | April 1, 2022 | Up to 10% |
| Pirelli | April 11, 2022 | Up to 10% |
| Continental | June 1, 2022 | Undisclosed |
| Michelin | June 1, 2022 | 5-12% |
| Pirelli | June 15, 2022 | Up to 10% |
| Goodyear | July 1, 2022 | Up to 10% |
| Bridgestone | July 1, 2022 | Up to 10% |
| Bridgestone | October 1, 2022 | Up to 9% |
| Michelin | January 1, 2023 | Up to 9% |
| Bridgestone | January 1, 2023 | Undisclosed |
| Pirelli | January 15, 2023 | Up to 10% |

49.    The average price of tires rose 21.4% between 2021 and 2023, more than 70%

---

[5] *Understanding Tire Price Increases: Insights From Major Manufacturers*, GIGA TIRES (Nov. 30, 2023), https://www.giga-tires.com/blog/understanding-tire-price-increases/.

higher than core inflation.[6]

**D.**    **There is No Explanation for Defendants' Parallel Price Increases Other than Collusion.**

50.    Defendants attributed their respective pricing to increased input costs.  But to the extent that input costs increased, that increase was insufficient to support the price increases listed above.  And in fact, the price of rubber – the primary material used in the manufacture of tires – fell  significantly in 2021 and 2022.

51.    Similarly, the price increase in tires far outpaced inflation.  ProPublica reported in March 2023 that the average price of Tires had risen 21.4% over a two-year period, 70% higher than core inflation.[7]

52.    These increases in volume and profits during the relevant period demonstrate that Defendants' explanations for their price increases were pretextual. Defendants' coordinated price increases can only be explained by the existence of a conspiracy to fix prices.

**E.**    **The Structure and Characteristics of the Tire Market Support the Existence of a Conspiracy.**

**1.**    **Tires are a Fungible Commodity.**

53.    Defendants produce similar models of Tires, for example, all-season, all-terrain, winter/snow, and summer models. Within each of these types, Tires do not differ significantly in quality, appearance, or use. As a result, Tires within a model are functionally interchangeable.

54.    When purchasing replacement Tires, consumers can choose among brands. Even when consumers are replacing less than a complete set of four tires, they can use tires from

---

[6] Michael Grabell, "Overinflated: Why Are Prices Still So High? Follow a Tire to Find Out. — ProPublica., Pro Publica (May 3, 2023).

[7] ProPublica, Overinflated: The Journey of Humble Tire Reveals Why Prices Are Still So High (May 3, 2023), available at https://www.propublica.org/article/inflation-Tires-rubber-imports-high-prices

different brands or models so long as certain features, such as tread depth, are similar.[8]  Thus, Tire "producers are not likely to be able to deviate much from the competitive price without losing sales."[9]

55.     When products are interchangeable, the primary way manufacturers compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where a product, like a Tire, is interchangeable, economics suggests that cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price-fixing agreement.[10]

56.     The fungible nature of replacement Tires is further demonstrated by the code sequence that describes seven specifications of that Tire. [11]



[8] Agota Szabo, *Should You Be Mixing Tire (Brands) On The Same Vehicle?*, PRIORITY TIRE (June 17, 2022), https://www.prioritytire.com/blog/should-you-be-mixing-tire-brands-on-the-same-vehicle/.

[9] Subhrendu K. Pattanayak, Brooks M. Depro, and Tayler H. Bingham, *Economic Analysis of the Rubber Tire Manufacturing MACT – Final Report*, U.S. Environmental Protection Agency, at 2-13 (Aug. 2000), https://www.epa.gov/sites/default/files/2020-07/documents/rubber-tire-mfg_ip_08-2000.pdf.

[10] *See* Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. U. L. Rev. 1581, 1592 (2021) ("a standardized product facilitates price fixing by making coordination more straightforward and enabling price fixers to more easily detect cheating on the cartel agreement").

[11] https://www.utires.com/articles/wp-content/uploads/2017/06/tire-numbers.png

14

a. **Type.** The first letter of the Tire code sequence represents the vehicle type. "P" represents passenger vehicles, including car, SUVs, and minivans. "LT" stands for light trucks and "ST" indicates special trailer.

b. **Width.** The next three numbers on a Tire indicate the width of the Tire in millimeters measured from sidewall to sidewall.

c. **Aspect Ratio.** The next number is the aspect ratio, which is the percentage of the Tire's height to its width.

d. **Construction Type.** Construction type is represented by a letter immediately following the aspect ratio. The most common construction types are "R," which indicates that the layers run radially across the Tire, "D," which indicates a diagonal or bias ply construction, and "B," where the Tire has a belted bias.

e. **Wheel Diameter.** The next number is the wheel diameter, which specifies the width of the rim which the Tire will fit.

f. **Load Index.** The next two- or three-digit number indicates the maximum weight the Tire can bear.

g. **Speed Rating**. Speed rating is represented by a letter that indicates the maximum speed.

57.     Furthermore, consumers looking to replace existing tires can choose almost any brand of replacement Tire. Even if consumers are replacing only some of the four Tires, they can use Tires manufactured by different Defendants if certain characteristics--such as tread depth--are similar.

58.     Where a group of manufacturers sell a fungible product, anticompetitive behavior is facilitated because manufacturers can monitor and policy each other's adherence to a conspiracy.

59.     In a competitive market, manufacture of a fungible product would lead to competitive pricing because that is the only way for a manufacturer to differentiate its product. As described herein, however, the market for replacement Tires did not behave as a truly competitive market.

**2.      The Tire Market is Highly Concentrated**.

60.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

61.     In 2022, the revenue shares from Defendants Bridgestone, Michelin, and Goodyear made up almost 64 percent of totally industry revenue for the U.S. Tire market. The remaining 36 percent of the market includes manufacturers such as Continental and Nokian.  Thus, Defendants controlled a dominant share of the market during the Class Period.

**3.      The Buy-Side of the Market is Not Highly Concentrated.**

62.     While the majority of Defendants' customers are independent Tire dealers, Defendants still make hundreds of millions, if not billions of dollars, in revenue from the highly-fragmented consumer market who purchase Tires at Defendants' wholly owned retail locations.

63.     Defendants sell Tires through various channels.  One of the largest channels is the Defendants' wholly owned retail locations.  In addition, Defendants sell tires through dealerships, mass merchandisers, warehouse clubs, and online Tire sites.

64.     The vast number of sales channels combined with the vast number of Tire purchasers, each of whom forms a small share of the total marketplace, facilitate a scheme to inflate the price of there is less incentive for cartel members to cheat on collusive pricing arrangements, since each potential sale is small but the cost of disrupting the anticompetitive behavior is significant.

**4.      Demand for Tires is Inelastic.**

65.     "Elasticity" describes the sensitivity of supply and demand to changes in one or

the other.  Demand is "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, such that customers have nowhere to turn for alternative, cheaper products of similar quality and continue to purchase despite a price increase.

66.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substation and lost sales revenue.

67.    Demand for Tires is highly inelastic because there are no close substitutes for these products.  Customers must purchase Tires as an essential part of almost every wheeled vehicle, even if the prices are at supra-competitive levels.  Likewise, under certain circumstances, a customer may need to replace her Tires, with no choice but to pay supracompetitive prices.

68.    Furthermore, Tires do not compete with other products in the functional sense; consequently, there is no inter-industry competition through cross-elasticities of demand.  Since the demand for Tires is derived from the need to use the automobile, buyers cannot be induced to buy more or less of the product in any significant sense through price changes.

69.    Because the price for Tires is highly inelastic, Defendants were able to and did collectively raise prices to supracompetitive levels without losing revenue. For example, Bridgestone America's chief operating officer reported, "[w]e're certainly seeing a red-hot economy that, despite the price increases and inflation, demand still remains quite strong."[12]

**E.    "Plus Factors" Corroborate Defendants' Conspiracy to Fix Tire Prices.**

70.    Defendants' actions, coupled with "plus factors" described below demonstrate

---

[12]   Tire Business, "Rising tire prices affected by several factors" (Jul. 8, 2022), available at: https://www.Tirebusiness.com/news/rising-Tire-prices-affected-several-factors.

concerted action in violation of federal antitrust laws. Defendants had motive and opportunity to enter into a price fixing conspiracy; Defendants acted contrary to their own self-interests; and there is additional evidence supporting the existence of a traditional conspiracy.

71.    The market for replacement Tires has structural characteristics found in collusive markets: high barriers to entry by competitors; the Market is highly concentrated; Defendants' Tires are fungible; and there are no reasonable substitutes for those Tires.

**1.    Defendants Had a Motive to Conspire.**

72.    Following the onset of the COVID-19 pandemic, profit and revenue in the tire industry decreased while the costs of goods sold increased. But a single Defendant who raised prices risked losing market share to competitors who did not follow the price increase. Defendants avoided this predicament by agreeing on coordinated price increases, as explained above.

73.    As the economy recovered from the economic fallout wreaked by the pandemic, inflation eased, supply chain logistics improved, and demand for replacement tires increased.

74.    The combination of a decreasing costs and an oversupply would result in prices in a competitive market. Here, however, prices for replacement tires remained high.

**2.    Defendants Had Opportunities to Conspire.**

75.    At least throughout the Class Period, Defendants had numerous and frequent opportunities to collude and fix the prices of Tires through trade association meetings and public communications.

76.    Every Defendant is a member of the U.S. Tire Manufacturers Association ("USTMA," www.ustires.org). The USTMA is the national trade association for tire manufacturers that produce tires in the United States.

77.    Senior executives from each of the Defendants currently serve on the Board of Directors of the USTMA. The USTMA holds a number of annual conferences and meetings where

18

Defendants had the opportunity to meet and discuss pricing.  For example, during the Class Period the USTMA holds a spring and fall meeting for its board members annually, including in July 2020, October  2021, January 2022, October 2022, April 2023, and October 2023.

78.     Defendants' membership in this organization provides them with additional regular and frequent opportunities to exchange competitively sensitive information and strategies and agree on common courses of anticompetitive conduct behind closed doors.

### 3.     The Tires Industry Has High Barriers to Entry.

79.     The market for Tires has four significant barriers to entry. *First*, the start-up costs associated with Tire manufacturing are prohibitive;[13] *second*, the ongoing costs of maintaining research and development facilities are also large and ongoing, requiring constant investments in facilities, machinery, and materials; *third*, Defendants have significant intellectual property protections over their products and methods of production; and *fourth*, loyalty for Defendants' Tires that has been solidified by decades of advertising and consumer use.

80.     As to exit barriers, because a huge investment is required to set up a manufacturing plant specialized to manufacture tires, it is extremely difficult to exit from the tire industry. Thus, consolidation is more likely than companies going out of business.

81.     Because the Tire market has high barriers to entry, it is more conducive to collusion. To maximize long-term profits, the prices must be sufficiently high to warrant participation in a criminal conspiracy but not so high as to lure new competitors into the market. When a market is protected by high barriers to entry, conspirators can set prices that are artificially high because they are protected against the entry of new competitors who might drive down the price.

---

[13] For example, Defendant Nokian recently completed a manufacturing facility in Dayton, Tennessee that cost $360 million.  Nokian Tyres, *Nokian Tyres' North American Factory* – Dayton, Tennessee, USA, https://www.nokiantires.com/daytonfactory/ (last accessed Feb. 13, 2024).

### 4. Tires Have Inelastic Demand.

82.     The price elasticity of demand refers to the relationship between the price and demand for a good.  "Inelastic demand" means that consumers' buying habits for a product remains relatively unchanged in the face of change to the product's price.  A market with inelastic demand is more susceptible to collusion and price-fixing because competitors can raise their prices without suffering a significant decrease in sales or profit.

83.     Drivers cannot operate their vehicles without tires; a driver cannot put off replacing a Tire for long once a replacement is needed.

84.     Furthermore, there is no cross-elasticity of demand for tires, as no reasonable substitutes exist.  Consequently, buyers will not be induced to buy more or fewer Tires through price changes.

85.     Because the price for Tires is highly inelastic, Defendants were able to collectively raise prices to supracompetitive levels without losing revenue.

### 5. Government Antitrust Authority Conducted Dawn Raids on Defendants.

86.     EC conducts raids if it has "reasonable grounds for suspecting an infringement of the competition rules."[14]

87.     On January 30, 2024, the EC announced it had carried out dawn raids at the premises of several companies active in the Tire industry:

> The Commission has concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union).

> The products concerned by the inspections are new replacement tyres for passenger cars, vans, trucks and busses sold in the European Economic Area. The Commission is concerned that price coordination took place amongst the inspected companies, including via public communications.

---

[14] Case No. T-135/09, *Nexans France SAS v. Comm'n*, 2012 E.C.R. 43, http://curia.europa.eu/juris/document/document_print.jsf?doclang=EN&text=&pageIndex=0&part=1&mode=lst&docid=129701&occ=first&di r=&cid=663482

88.     Defendants Pirelli, Continental, Michelin, Nokian, Goodyear, and Bridgestone have confirmed that they are subjects of the EC investigation.

### 6.     Defendants are Recidivist Antitrust Violators.

89.     In 2008, the South African Competition Authority conducted raids at the premises of Bridgestone South Africa (Pty) Ltd., Dunlop, and the South African Tyre Manufacturers' Conference. As a result of these raids, South African's competition authority issued fines against Goodyear and Continental.

90.     Bridgestone South Africa (Pty) Ltd. escaped a fine after admitting to price fixing and receiving conditional immunity after filing a leniency application with the regulator. In that application, Bridgestone South Africa admitted to telephonic discussions and meetings with its competitors in 1999-2007.  These meetings, which were attended by the tire manufacturers' sales and marketing representatives, coordinated the timing and the average percentage price increase of tires, agreed on the discount structure for tire dealers and the explanations to be given to the market as a pretext for the increases.[15]

## V.     ANTICOMPETITIVE EFFECTS

91.     Defendants' anticompetitive conduct had anticompetitive effects, including: (a) stabilizing, maintaining or fixing the price of tires at artificially high levels, (b) restraining or eliminating competition among Defendants in the market for Tires, fixing, and (c) depriving Plaintiff and the Class of the benefit of free and open competition.

92.     Defendants' violations of the antitrust laws caused Plaintiff and members of the Class to pay artificially inflated for Tires.  This is the type of injury that the antitrust laws were intended to prevent and compensate.

---

[15] Tire Review Staff, *Heavy Penalty Sought in South Africa Price Fix Scheme*, TIRE REVIEW (Sept. 8, 2010), https://www.tirereview.com/heavy-penalty-sought-in-south-africa-price-fix-scheme/.

93.    Defendants' price fixing conspiracy is *per se* unlawful.

VI.    **FRAUDULENT CONCEALMENT AND TOLLING**

94.    The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

95.    Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice of Defendants' conspiracy.  Therefore, Plaintiff and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until January 30, 2024, when the European Commission announced it had conducted raids in, and was investigating, the Tire industry.

96.    The Tires market is not exempt from antitrust regulation.  Plaintiff and the other Class members thus reasonably assumed until shortly before the Complaint's filing that this market was behaving in a competitive manner.

97.    Throughout the Class Period set forth in this Complaint, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and Class members.  Defendants did not inform purchasers that the price they paid for Tires was artificially inflated; in fact, Defendants attributed anti-competitive price increases to forces that would be present in a truly competitive market.  For example, Michelin attributed its 12% price increase on passenger and light truck Replacement Tires in 2022 to "market dynamics."[16]  Goodyear justified a July 2022 price increase on consumer tires to rising

---

[16]  Michelin North America, Inc., *Michelin Implements Price Increase Across Passenger Brands and Commercial Offers in North American Market*, PR NEWSWIRE (Dec. 1, 2021), https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across-passenger-brands-and-commercial-offers-in-north-american-market-301435108.html.

raw-materials and other inflation-impacted costs.[17] Pirelli attributed its January 2022 price increase to "changing market conditions."[18]

98.    Although Plaintiff exercised reasonable diligence, such diligence would not have, and did not, reveal the Defendants' conspiracy because Defendants used deceptive practices to conceal their combination.

99.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiff and the Class as a result of Defendants' anticompetitive and unlawful conduct. Plaintiff and the other members of the Class were unaware of Defendants' unlawful conduct and did not know they were paying supra-competitive prices for Tires during the Class Period.  For these reasons, Plaintiffs claims are timely under the federal laws identified herein.

## VII.    CLASS ALLEGATIONS

100.    Plaintiff brings this action on behalf of himself, as representative of the class defined below, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

> All persons or entities who directly purchased Tires directly from one or more Defendants within the United States and its territories from at least January 1, 2020 through the present (the "Class Period").

Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

101.    Excluded from the class are federal and state governmental entities and judicial officers presiding over this case as well as Defendants, their subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interested, and Defendants' current or former executives, officers and directors.

102.    **Numerosity:** The Class is so numerous that joinder of all members in this action is

---

[17]  *See Goodyear to Raise North America Tire Prices July 1*, *supra* note 72.

[18]  *See* Danielle Hess, *supra* note 74.

impracticable.  There are hundreds of thousands of geographically dispersed Class members.

103.    The Class members, moreover, can be readily identified and notified in an administratively feasible manner using, among other information, the electronic transactional records of Defendants.

104.    **Typicality:**  Plaintiff's claims are typical of those of the Class.  Plaintiff and all members of the Class allege that Defendants' alleged misconduct violates Section 1 of the Sherman Act.  Plaintiff and all Class members also allege and will show that they were injured by the same anticompetitive and unlawful conduct that resulted in them paying more for Tires than they would have paid in the absence of Defendants' collusive conduct.

105.    **Adequacy:**  Plaintiff fairly and adequately will protect and represent the interests of Class members. The interests of Plaintiff and Plaintiff's counsel are fully aligned with, and not antagonistic to, the interests of the Class members.  Plaintiff is willing and able to assume the duties of a class representative to protect the interests of all Class members.  In addition, Plaintiff's counsel have significant experience successfully prosecuting complex antitrust class actions and possesses the necessary resources to vigorously litigate the case on behalf of the Class.

106.    **Commonality and Predominance:**  There are multiple questions of law and fact that are common to the Class, including:

> a.  Whether Defendants entered into a formal or informal agreement, combination, conspiracy, or common understanding in which Defendants artificially raised prices for Tires at any time during the Class Period;
>
> b.  Whether Defendants' alleged misconduct caused Class members to pay prices for Tires that were higher than they would have been in the absence of Defendants' alleged misconduct;
>
> c.  Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class-

wide measure of damages;

    d.   The proper measure of Class-wide damages;

    e.   Whether Defendants fraudulently concealed the existence of the alleged conspiracy such that the statute of limitations is tolled; and

    f.   The nature and scope of injunctive relief necessary to restore competition.

107.   Questions of law and fact common to the members of the Class will predominate over any individualized questions of law or fact. Defendants have acted and refused to act on grounds generally applicable to the Class.

108.   Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow the hundreds of thousands of Class members to prosecute their common claims, and for Defendants to defend themselves against these claims, in front of a single court simultaneously and efficiently before ultimately reaching resolution without unnecessary duplication of effort and expense that separate actions would present. The benefits of proceeding with this procedural mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

109.   Defendants acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

110.   Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation, and there will be no material difficulty in the management of this action as a class action. Thus, a class action is superior to other alternatives for the fair and efficient adjudication of this controversy.

111.   The prosecution of separate actions by class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FIRST CLAIM FOR RELIEF
### (Agreement in Restraint of Trade in Violation of
### Section 1 of the Sherman Act, 15 U.S.C. § 1)

112. Plaintiff realleges and incorporates by reference the claims and allegations set forth in Paragraphs One (1) through One Hundred Eleven (111), inclusive, above as if the same were fully rewritten herein.

113. Beginning at least as early as January 1, 2020, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

114. The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to artificially restrain competition with respect to the price and supply of replacement tires sold within the United States for passenger cars, vans, trucks and buses.

115. This conspiracy caused Plaintiff and the other Class members to pay artificially inflated prices directly to Defendants and their co-conspirators for tires during the Class Period.

116. The contract, combination, or conspiracy alleged herein constitutes a *per se* violation of Section 1 of the Sherman Act.

117. In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including the acts discussed above and those that follow:

        a.    Exchanged competitively sensitive information among themselves in furtherance of their conspiracy to fix, increase, maintain or stabilize the price of Tires in the United States during the Class Period;  and

        b.    Defendants engaged in various forms and methods of bilateral and multilateral communication across various settings and venues concerning Tire pricing and otherwise to fix, increase, maintain, or stabilize the price of Tires in the United States that had the purpose

and effect of maintaining and reinforcing their anticompetitive scheme.

118. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for Tires than they would have paid in the absence of the conspiracy.

119. Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

120. Plaintiff seeks monetary and injunctive relief on behalf of herself and all other members of the Class under Section 4 of the Clayton Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Christine Anderson, on behalf of herself and a Class of all others similarly situated, respectfully requests judgment against Defendants and each of them, jointly and severally, as follows:

A. The Court determine that this action may be maintained as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B. The unlawful conduct, conspiracy, or combination alleged herein be found, adjudged and decreed to violate of Section 1 of the Sherman Act;

C. Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable laws, and that such judgment in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled under applicable law;

D.  Defendants, their affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.  Plaintiff and the members of the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law;

F.  Plaintiff and the members of the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law; and Plaintiff and the members of the Class be awarded any other relief as the case may require and the Court may deem just and proper.

Dated:  April 9, 2024

/s/ *Eric H. Zagrans*

Eric H. Zagrans (0013108)
ZAGRANS LAW FIRM LLC
1640 Roundwyck Lane
Columbus, Ohio 43065-8416
(440) 452-7100 (telephone)
eric@zagrans.com (e-mail)

and

Garrett D. Blanchfield (*pro hac vice* motion forthcoming)
Roberta A. Yard (*pro hac vice* motion forthcoming)
REINHARDT WENDORF & BLANCHFIELD
222 South 9th Street, Suite 1600
Minneapolis, MN 55402
(651) 287-2100 (telephone)
g.blanchfield@rwblawfirm.com (e-mail)
r.yard@rwblawfirm.com (e-mail)

*Attorneys for Plaintiff*

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

/s/ *Eric H. Zagrans*

Eric H. Zagrans